NOT YET SCHEDULED FOR ORAL ARGUMENT

————————————

Nos. 14-7060 & 14-7061

————————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

UNITED STATES *ex rel.* MICHAEL L. DAVIS,
APPELLANT/CROSS-APPELLEE,

v.

DISTRICT OF COLUMBIA,
APPELLEE/CROSS-APPELLANT.

————————————

ON APPEALS FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

————————————

**BRIEF FOR APPELLEE/CROSS-APPELLANT
THE DISTRICT OF COLUMBIA**

————————————

EUGENE A. ADAMS
Interim Attorney General for
the District of Columbia

TODD S. KIM
Solicitor General

LOREN L. ALIKHAN
Deputy Solicitor General

STACY L. ANDERSON
Senior Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
441 4th Street, NW, Suite 600S
Washington, D.C. 20001
(202) 724-6625
stacyl.anderson@dc.gov

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A.    *Parties and amici*.—The relator in this *qui tam* case below was Michael L. Davis.   He is the appellant/cross-appellee here. The District of Columbia was a defendant below and is the appellee/cross-appellant here.   The District of Columbia Public Schools was also a defendant below, but was terminated as a party on February 18, 2010, as *non sui juris*.   *United States ex rel. Davis v. District of Columbia*, 591 F.Supp.2d 30, 40 (D.D.C. 2008).   The United States of America and Maximus, Inc. were interested parties below.   There were no *amici* below and none have appeared in this Court.

B. *Ruling under review*.—Appellant and cross-appellant both appeal District Judge John D. Bates's March 31, 2014, order granting in part and denying in part the parties' cross-motions for summary judgment.

C. *Related cases*.—The following are related cases: *Davis v. Williams*, No. 03-CV-000284, 2003 WL 2541567 (D.C. Super. Ct. July 31, 2003), *aff'd sub nom. Davis & Assocs. v. Williams*, 892 A.2d 1144 (D.C. 2006); *Davis v. District of Columbia*, 501 F.Supp.2d 77 (D.D.C. 2007); *United States ex rel. Davis v. District of Columbia*, No. 1:06-CV-00489-JFM (D.D.C. dismissed Oct. 6, 2009), *aff'd*, *United States ex rel. Davis v. District of Columbia*, No. 09-5427 (D.C. Cir. Feb. 15, 2011); *United States ex rel. Davis v. District of Columbia*, 679 F.3d 832 (D.C. Cir. 2012).

i

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ..............................................................1

STATEMENT OF THE ISSUES ...............................................................1

STATEMENT OF THE CASE......................................................................2

    1.    Procedural Background. ......................................................2

    2.    Summary Judgment Evidence...........................................5

        a.    The District's Medicaid program. ..................................5

        b.    Davis's interim claims on behalf of DCPS for Medicaid reimbursement during FY1998. ..................................10

        c.    Davis's FY1998 cost report. .....................................11

        d.    DCPS's rejection of Davis's cost report. ...................13

        e.    The Maximus cost report. ..........................................14

        f.    MAA's initial settlement of the FY1998 reimbursement..........16

        g.    Davis's complaints to DCPS about the Maximus report. .........16

        h.    The independent review of Maximus's cost reports. ...............17

    3.    The District Court's Decision...........................................23

STANDARD OF REVIEW ......................................................................25

SUMMARY OF ARGUMENT.................................................................26

ARGUMENT ..........................................................................................30

    I.    The District Is Entitled To Summary Judgment On The Question Whether The District Submitted A False Claim To The Government. ........................................................30

A.    Davis's implied false-certification theory of FCA liability requires him to show first that the District falsely certified that it had physical possession of documents supporting its transportation cost report; second that physical possession was a condition for reimbursement; and third that the District knew as much. ..............................31

1.    The law...........................................................................31

2.    Davis's claim. ..............................................................34

B.    The implied certification was not false; Davis has not shown, and cannot prove, that the District did not physically possess supporting documentation for its transportation cost report. ..........................................36

1.    An essential predicate underlying Davis's FCA claim—that the District had "no," or lacked "any," documentation to support its transportation cost report—is refuted by the evidence. ................................36

a.    Cost data. ..............................................36

b.    Service documentation. ........................................37

2.    Davis has not shown that the documentation the District did possess was insufficient to support its transportation cost report.................................42

C.    The implied certification was not a prerequisite for, or material to, the payment decision, particularly where CMS was fully aware of the facts and paid in excess of the amount requested. ..............................................44

1.    Physical possession of service documentation was not an express condition for payment............................44

2.    The purported lack of service documentation was not material to CMS's decision to provide the District with additional FFP...........................................47

iii

D.      The implied false certification was not knowing. .....................49

II.   Even If The Transportation Cost Report Contained An Implied
      False Certification, Its Submission Amounted To One False
      Claim. ...............................................................................................51

      A.      The District's transportation cost report constituted a
              single claim under the plain language of the FCA. .................52

      B.      The conduct at issue—making a single implied false
              certification—gives rise to only one false claim. ....................52

      C.      Davis's efforts to turn a single purportedly false
              certification into 82,615 instances of fraud should be
              rejected. ..................................................................................53

CONCLUSION .....................................................................................................61

# TABLE OF AUTHORITIES*

*Cases*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..................................... 25, 26

*Anna Jacques Hosp. v. Sebelius*, 583 F.3d 1 (D.C. Cir. 2009)..................................5

*Associated Gen. Contractors of Am., San Diego Chapter, Inc. v. Cal. Dep't of Transp.*, 713 F.3d 1187 (9th Cir. 2013) ..........................................10

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)..........................................................26

*Chapman v. U.S. Dept. of Health & Human Servs.*, 821 F.2d 523 (10th Cir. 1987) ..............................................................................59

*Gonzalez v. Fresenius Med. Care N. Am.*, 689 F.3d 470 (5th Cir. 2012)................46

*Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280 (2010)..................................................................................................2

*Greene v. Davis*, 164 F.3d 671 (D.C. Cir. 1999)......................................................38

*Haynes v. Williams*, 392 F.3d 478 (D.C. Cir. 2004)..................................................26

*\*Hays v. Hoffman*, 325 F.3d 982 (8th Cir. 2003) ......................................................58

*Horras v. Leavitt*, 495 F.3d 894 (8th Cir. 2007)......................................................59

*King v. Dogan*, 31 F.3d 344 (5th Cir. 1994)............................................................10

*Nat'l Mining Ass'n v. Kempthorne*, 512 F.3d 702 (D.C. Cir. 2008) ........................60

*Patel v. Allstate Ins. Co.*, 105 F.3d 365 (7th Cir. 1997) ..........................................25

*Tate v. District of Columbia*, 627 F.3d 904 (D.C. Cir. 2010)..................................25

---

\*       Authorities upon which we chiefly rely are marked with asterisks.

*United States ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.,
    764 F.3d 699 (7th Cir. 2014) ........................................................ 43, 61

United States ex rel. Augustine v. Century Health Servs., Inc., 136 F.Supp.2d
    876 (M.D. Tenn. 2000), aff'd, 289 F.3d 409 (6th Cir. 2002) ..............................52

*United States ex rel. Conner v. Salina Reg'l Health Ctr.,
    543 F.3d 1211 (10th Cir. 2008) ....................................... 31, 32, 33, 46, 47, 48, 60

United States ex rel. Davis v. District of Columbia, 265 F.R.D. 1 (D.D.C. 2010) ....4

United States ex rel. Davis v. District of Columbia,
    591 F.Supp.2d 30 (D.D.C. 2008) ....................................................3, 4

*United States ex rel. Davis v. District of Columbia,
    679 F.3d 832 (D.C. Cir. 2012)................................................ 2, 4, 5, 31

United States ex rel. Davis v. District of Columbia,
    773 F.Supp.2d 21 (D.D.C. 2011) ........................................................4

*United States ex rel. Hobbs v. Medquest Assocs., Inc.,
    711 F.3d 707 (6th Cir. 2012) ........................................................ 32, 46

*United States ex rel. Mikes v. Straus, 274 F.3d 687 (2d Cir. 2001) .... 31, 32, 33, 46

United States ex rel. Roberts v. Aging Care, Inc.,
    2007 WL 4522465 (W.D. La. 2007) ....................................................54

United States ex rel. Roberts v. Aging Care, Inc.,
    474 F.Supp.2d 810 (W.D. La. 2007) ....................................................54

*United States ex rel. Siewick v. Jamieson Sci.& Eng'g, Inc.,
    214 F.3d 1372 (D.C. Cir. 2000)................................................ 32, 46

United States ex rel. Steury v. Cardinal Health, Inc.,
    735 F.3d 202 (5th Cir. 2013) ........................................................33

United States ex rel. Swan v. Covenant Care, Inc.,
    279 F.Supp.2d 1212 (E.D. Cal. 2002)................................................49

United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,

125 F.3d 899 (5th Cir. 1997) .............................................................................47

*United States ex rel. Tyson v. Amerigroup Ill., Inc.*,
    488 F.Supp.2d 719 (N.D. Ill. 2007) ......................................................53

*\*United States ex rel. Wilkins v. United Health Grp., Inc.*,
    659 F.3d 295 (3d Cir. 2011) ..................................................... 34, 47, 48

*United States ex rel. Williams v. Renal Care Group*, 2011 WL 2118231
    (M.D. Tenn. 2011), *rev'd on other grounds*, 696 F.3d 518 (6th Cir. 2012) .........55

*United States v. Bajakajian*, 524 U.S. 321 (1998) ...................................60

*United States v. Bornstein*, 423 U.S. 303 (1976) .....................................53

*United States v. Bourseau*, 2006 WL 2961105 (S.D. Cal. 2006),
    *aff'd*, 531 F.3d 1159 (9th Cir. 2008) ......................................................55

*United States v. Khan*, 2009 WL 2461031 (E.D. Mich. 2009) ..............55

*United States v. Krizek*, 111 F.3d 934 (D.C. Cir. 1997) ................... 53, 59

*United States v. Mackby*, 261 F.3d 821 (9th Cir. 2001) ..........................60

*United States v. Rogan*, 459 F.Supp.2d 692 (N.D. Ill. 2006),
    *aff'd*, 517 F.3d 449 (7th Cir. 2008) .......................................................55

*\*United States v. Sci. Applications Int'l Corp.*,
    626 F.3d 1257 (D.C. Cir. 2010).................................. 31, 32, 33, 34, 49

*Visiting Nurse Ass'n of Brooklyn v. Thompson*,
    378 F.Supp.2d 75 (E.D.N.Y. 2004) .......................................................55

## Statutes

28 U.S.C. § 1291 ........................................................................................1

28 U.S.C. § 1331 ........................................................................................1

31 U.S.C. § 3729(a) ................................................................. 2, 44

31 U.S.C. § 3729(a)(1) ........................................................... 3, 34

31 U.S.C. § 3729(a)(3) ................................................................. 3

31 U.S.C. § 3729(b)(1) ............................................................... 34

31 U.S.C. § 3729(c) ..................................................................... 52

31 U.S.C. § 3730(b)(4)(B) ........................................................... 3

31 U.S.C. § 3730(e)(4) ................................................................. 4

31 U.S.C. § 3731(b)(1) ............................................................... 23

42 U.S.C. § 1320a-7a ................................................................. 58

42 U.S.C. § 1396a(a)(30)(A) ........................................................ 6

42 U.S.C. § 1396d(b) ................................................................... 5

False Claims Act, 31 U.S.C. § 3729 *et seq* ...........................1, 2

Individuals with Disabilities Education Improvement Act,
   20 U.S.C. § 1400 *et seq*.............................................................6

Medicare Catastrophic Coverage Act of 1988, Pub. L. No. 100-360,
   102 Stat. 683 .............................................................................6

## Rules

Fed. R. Civ. P. 56(c) ..................................................................25

## Regulations

28 C.F.R. § 85.3(a)(9) ..................................................................2

42 C.F.R. § 400.203 .....................................................................6

42 C.F.R. § 413, Subparts A-G ............................................................7

42 C.F.R. § 413.20(a) (2000) ............................................................44

42 C.F.R. § 413.20(d)(2) (2000) .......................................................45

42 C.F.R. § 413.24(a) (2000) ............................................................44

42 C.F.R. § 413.24(f)(5)(i) (2000) ....................................................46

42 C.F.R. § 413.64(f)(2) (2000) ................................................ 16, 45

# GLOSSARY

| | |
|---|---|
| CMS | United States Department of Health and Human Services Centers for Medicare and Medicaid Services |
| DCPS | District of Columbia Public Schools |
| FCA | False Claims Act, 31 U.S.C. § 3729 *et seq*. (2000) |
| FFP | Federal Financial Participation |
| FY | Fiscal Year |
| IEP | Individualized Education Plan |
| MAA | District of Columbia Department of Health Medical Assistance Administration |

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 because this case arises under the False Claims Act, 31 U.S.C. § 3729 *et seq*. This Court has jurisdiction under 28 U.S.C. § 1291 because a final judgment was entered on March 31, 2014, and the parties timely noted appeals on April 28 and 29, 2014.

## STATEMENT OF THE ISSUES

1. Whether the District of Columbia is entitled to summary judgment on the allegation that it violated the False Claims Act by knowingly submitting a request for payment that included an implied false certification of compliance with a Medicaid regulation where relator's proof fails on each element of his claim—the implied certification was not false, compliance with the cited regulations was not a condition of payment, and the District did not act with the requisite scienter.

2. Whether, assuming the District submitted a false claim, the District is liable for more than one civil penalty where the false claim consisted of a single implied false certification associated with the submission of a single, year-end cost report and where it is conceded that the report accurately reflects the cost of Medicaid services that were provided and the interim claims for reimbursement that the report addressed were not false when separately submitted for payment.

# STATEMENT OF THE CASE

## 1.    Procedural Background.

Relator Michael Davis brought this *qui tam* action on behalf of the United States pursuant to the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*[1]  Davis filed his sealed complaint and disclosure statement on April 4, 2006.  A.3.

At the time of the alleged fraud, the FCA provided that:

(a) Any person who—

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval; [or] . . .

(3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid; . . .

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person . . . .

31 U.S.C. § 3729.  The penalty for violations occurring after September 29, 1999, was increased to $5,500 to $11,000.  28 C.F.R. § 85.3(a)(9).

Davis alleged in Count I that the District and the District of Columbia Public Schools ("DCPS") "knowingly present[ed] false claims for Medicaid

---

[1]    All references are to the 2000 version of the FCA, which was in effect when the fraud was alleged to have occurred.  Subsequent amendments do not apply retroactively.  *See Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 283 n.1 (2010); *United States ex rel. Davis v. District of Columbia*, 679 F.3d 832, 835 (D.C. Cir. 2012).

reimbursement to the . . . Government" when they submitted their fiscal year ("FY") 1998 Special Education Cost Settlement and Special Education Transportation Cost Settlement to the District's Medical Assistance Administration, in violation of 31 U.S.C. § 3729(a)(1). A.19, 23. Davis asserted that the claims were false because the District did not have physical possession of any documentation supporting the cost-based requests for additional Medicaid reimbursement, as those documents were in his possession. A.17, 19, 23. In Count II, Davis alleged a related conspiracy to defraud the government in violation of 31 U.S.C. § 3729(a)(3). A.20. Davis sought treble damages for these violations. A.19-20.

After the United States declined to intervene, Davis pursued the litigation alone, 31 U.S.C. § 3730(b)(4)(B), and the district court unsealed the complaint and ordered it served. A.3.

Initially, the District moved to dismiss Davis's complaint for failure to state a claim. A.3. The district court granted that motion in part. *United States ex rel. Davis v. District of Columbia*, 591 F.Supp.2d 30 (D.D.C. 2008). The court dismissed Davis's claims for treble damages and conspiracy, finding that he had not alleged the United States suffered an actual loss. *Id.* at 39-40. Rather, according to Davis, the District submitted a claim reflecting approximately $60 million in cost-based expenditures while concededly this was the actual cost of

3

Medicaid services provided to Medicaid-eligible special-education students.  *Id*. This left Davis with one claim against the District for civil penalties—an allegation that the District's cost reports contained an implied false certification that the District physically possessed supporting documentation when the reports were submitted.

Davis subsequently amended his complaint to change the date upon which the cost reports were submitted from March 2002 to January 2000.  A.8, 10; Dkt.73, 81, 82; *United States ex rel. Davis v. District of Columbia*, 265 F.R.D. 1 (D.D.C. 2010).[2]  Davis then moved for summary judgment, and the District moved to dismiss Davis's amended complaint for lack of jurisdiction.  A.9.  The district court granted the District's motion, finding that it lacked subject matter jurisdiction because Davis did not satisfy the "original source" requirement for bringing an FCA action.  A.9; *United States ex rel. Davis v. District of Columbia*, 773 F.Supp.2d 21 (D.D.C. 2011); 31 U.S.C. § 3730(e)(4).

Davis appealed, challenging the earlier dismissal of his treble-damages and conspiracy claims and the district court's determination that he was not an original source of the fraud allegations.  *United States ex rel. Davis v. District of Columbia*, 679 F.3d 832, 836 (D.C. Cir. 2012).  This Court reversed on the jurisdictional

_____

[2]      Davis has not included his superseding amended complaint in the appendix. It is Dkt.82.

issue, but affirmed the dismissal of Davis's treble-damage and conspiracy claims.

*Id.* at 836-39.  With respect to damages, the Court held:

> Davis does not allege that any services paid for were not provided.
> The sole defect Davis claims is the failure to maintain documentation
> for those services. . . .  [T]he defect in this case in no way calls into
> question the value of the medical care provided by DCPS.  The
> purpose of maintaining documentation is to ensure that the
> government pays only for services actually provided.  Because all
> agree that the services paid for were provided, the maintenance of
> documents to prove that they were has no independent monetary
> value.

*Id.* at 840.

The Court remanded the case for the district court to determine whether

Davis could prove a claim for civil penalties.  *Id.*  On remand the parties filed

cross-motions for summary judgment.

## 2.    **Summary Judgment Evidence.**[3]

### a.    **The District's Medicaid program.**

Medicaid is a joint federal and state program that funds medical services for

low-income and disabled individuals.    A.273-74; Dkt.88-7 at 12[4]; 42 U.S.C.

§ 1396d(b).   The federal government's portion of Medicaid reimbursements is

known as the "federal financial participation" ("FFP").    A.274; 42 C.F.R.

---

[3]     Davis's assertions that lack citations to the record or authority should be
rejected.  *Anna Jacques Hosp. v. Sebelius*, 583 F.3d 1, 7 (D.C. Cir. 2009).

[4]     Page-number references to docketed filings reflect the ECF-assigned page
numbers.

§ 400.203.  In the District, the federal contribution is 70% of the reimbursable cost for services.  A 274; Dkt.88-7 at 12.

Section 411(K)(13) of the Medicare Catastrophic Coverage Act of 1988, Pub. L. No. 100-360, 102 Stat. 683, allows Medicaid reimbursement for health-related services that are provided to children under the Individuals with Disabilities Education Improvement Act, 20 U.S.C. § 1400 *et seq.*  A.274, 328; Dkt.88-7 at 13. The Medicaid-eligible child's Individualized Education Plan ("IEP") under that Act must prescribe the services and the other Medicaid requirements for reimbursement must be met.  A.274, 328; Dkt.88-7 at 14.

The United States Department of Health and Human Services administers the Medicaid program.  A.256.  The Department has delegated its administrative responsibilities to the Centers for Medicare and Medicaid Services ("CMS"). CMS has oversight responsibilities for all state Medicaid programs, including the District's.  A.256, 274; Dkt.88-7 at 12.

The District administers its Medicaid program in accordance with federal regulations and CMS requirements.  A.274; *see* 42 U.S.C. § 1396a(a)(30)(A). Under these regulations, the District (and all states) must implement a State Health Plan with specific minimum criteria for coverage and payment of Medicaid claims. A.256, 274.  The District has such a plan.  A.508-36.

6

The Medical Assistance Administration ("MAA") within the District's Department of Health administered the District's Medicaid program during the relevant period.  A.256, 274, 328; Dkt.78-14 at 4; 88-7 at 12.  In 1994, MAA certified DCPS as a provider of medical services for Medicaid-eligible special-education students pursuant to its State Health Plan.  A.251, 269, 329.  Provider numbers were assigned to four DCPS units: the Mamie D. Lee School and the Sharpe School, schools for severely disabled children; the Prospect Schools, an umbrella facility that covered services provided to children by private schools outside the District; and DCPS's transportation system.  A.269, 295, 329; Dkt.78-14 at 4.

DCPS is considered a "public provider" under the District's Medicaid program because it is a government agency, rather than a private entity.  A.275, 517; 42 C.F.R. § 413, Subparts A-G.  Under the State Health Plan, services provided by DCPS fall under the Medicaid coverage category of "clinic services," and the District's State Health Plan reimburses it "for 100 percent of their reasonable costs of providing services to Medicaid beneficiaries."  A.275, 517; Dkt.78-14 at 4; 42 C.F.R. § 413, Subparts A-G (2000).

Pursuant to the District's State Health Plan, DCPS receives reimbursement for Medicaid services as follows:

> 1.  Reimbursement for public clinics['] services will be determined in accordance with Medicare's Principles of Reasonable Cost

> Reimbursement described at 42 [C.F.R. §] 413, Subparts A-G.  That
> means that the Medicaid Agency will reimburse public clinics for 100
> percent of their reasonable costs of providing services to Medicaid
> beneficiaries. . . .
>
> 2.  The Medicaid Agency may use interim rates to pay for the various
> services provided by public clinics.  Interim rates are based on each
> facility's estimated costs and are facility specific and service specific.
> However, the Medicaid Agency may, at its discretion, use interim
> daily rates . . . for some clinics, where many services are provided
> every day to the same persons.  For example, the Medicaid Agency
> may pay an interim daily rate for all the allowable medical service
> costs provided to the Medicaid eligible children at the Mamie D. Lee
> School and the Sharpe School instead of paying on a fee-for-service
> basis.

A.517; *accord* A.251, 257.

During the fiscal year, DCPS obtains interim Medicaid reimbursements

under the following procedures:

> DCPS submits bills to MAA only for IEP-authorized medical services,
> and MAA processes the bills by applying the usual Medicaid claims
> processing edits.  For each bill that passes the appropriate edits in
> MAA's automated claims processing system, MAA computes an
> appropriate interim payment, but forwards only the Federal share of
> the interim payment to DCPS.

A.329; *accord* A.251, 257, 266, 275.  MAA submits quarterly reports to CMS

reflecting the District's Medicaid expenditures, including the District's claim for

FFP.  A.269, 274, 328.

The interim Medicaid reimbursements are based on fixed payments for

individual services, but may not reflect the services' actual costs.  A.251, 257, 266.

Thus, at the end of the year, DCPS prepares and submits a cost report.  A.251, 275-

76, 329; Dkt.78-14 at 5; 88-7 at 18.  The cost report reflects DCPS's actual, rather than estimated, cost of services provided to Medicaid-eligible special-education students during the fiscal year.  A.251, 266, 329; Dkt.88-7 at 18.  Payments DCPS has received from MAA via the periodic, interim billings are compared to the actual cost of services to determine whether additional lump-sum monies are due to, or owed by, DCPS.  A.329; Dkt.88-7 at 18.

After receiving DCPS's cost report, MAA makes an initial settlement based on the costs reported and then submits the report to an independent auditor for review.  A.257, 276, 329.  After that review, MAA determines the final actual and reasonable costs of Medicaid services provided and settles the claim by either paying the balance due to, or collecting the balance owed, by DCPS.  A.251, 275-76, 295, 329, 518.[5]

---

[5]    With respect to the year-end cost report, the District's State Health Plan provides:

> 3.  All public clinics must submit an annual accounting of their costs, on a cost report from provided by the Medicaid Agency.  No less than once every two years the Medicaid Agency will review the cost reports ("review" means either a desk review or audit) and determine each facility's final actual and reasonable costs in accordance with the principles described above in step 1.  Final costs will be compared to interim payments and settlements will be completed.

A.518.

9

**b.     Davis's interim claims on behalf of DCPS for Medicaid reimbursement during FY1998.**

According to Davis, in 1995, DCPS awarded his company a contract to design, develop, and implement a "Medicaid Reimbursement Recovery Program" for DCPS's special education program.  A.22.[6]  For years, Davis, "acting on behalf of DCPS," was responsible for designing forms to capture the "data" needed for Medicaid claims reimbursement; collecting the data; submitting the data to the District's MAA for payment of claims to DCPS; reconciling approved, denied, or pending Medicaid claims; and maintaining "appropriate original claim documentation for audit purposes."  A.22.

During FY1998, DCPS received Medicaid reimbursement through the receipt of interim payments for providing services to Medicaid-eligible special-education students.  A.99; Dkt.78-2 at 6; 78-14 at 4; 82 at 4.  The interim payments were based on claims prepared and submitted by Davis.  Dkt.82 at 3-4.  According to James Roark, Davis's associate, DCPS submitted 399,960 itemized Medicaid-eligible claims for interim reimbursement during FY1998.  A.211-12.

---

[6]     Neither Davis's original complaint nor his amended complaint is verified.  A.21; Dkt.82.  Thus, they do not constitute competent summary judgment evidence.  *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994); *Associated Gen. Contractors of Am., San Diego Chapter, Inc. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1195 (9th Cir. 2013).  Davis's reliance on his original complaint as evidence here is, thus, misplaced.  *E.g.*, Br. 1-2, 7-8.

10

To obtain reimbursement, Davis collected supporting "data" from DCPS and submitted that data with interim claims to MAA on a monthly basis.  A.22, 258, 270.  During FY1998, DCPS collected nearly $14 million in FPP from the claims Davis prepared.  A.306, 346-47, 378.  There is no dispute that when the District filed these claims, the claims satisfied all requirements for Medicaid reimbursement—DCPS provided the services, the students were eligible for the services, and DCPS possessed the requisite supporting documentation.  Thus, there is no allegation that these 399,960 claims were false when submitted by Davis to MAA for payment.

### c.     Davis's FY1998 cost report.

In December 1998, DCPS told Davis that his contract would not be renewed and that Maximus Corporation ("Maximus") would be the new contractor.  A.22. Maximus was to prepare the cost reports for FY1998.  Dkt.92-1 at 2.

Nevertheless, Davis completed his work for FY1998 by preparing a year-end cost report.  Dkt.82 at 4.  Davis transmitted a FY1998 "Cost Settlement Claim" to DCPS on June 15, 1999.  A.483.  The cost report reflected a gross Medicaid-reimbursable amount of $67.6 million, of which $47.3 million, or 70%, was in FFP.  A.483.  Total reimbursements were divided between school-based medical services ($51.4 million) and transportation costs ($16.2 million).  A.488.  The difference between interim FFP payments that had been received by DCPS ($14

11

million) and the FPP Davis calculated ($47.3 million) was $33.3 million in additional FPP owed to the District according to Davis. A.306, 346-47, 378. With respect to transportation (which is all that is relevant on appeal), Davis calculated the total FFP as almost $11.4 million, *i.e.*, 70% of $16.2 million.

According to Davis, his transportation calculations were "based on information provided by DCPS," as well as information contained in the District's Comprehensive Annual Financial Report for FY1998. A.483. When he prepared his cost report, however, Davis lacked a list of special education students for the school year, among other things. A.483. Instead, he determined the "percentage of Medicaid eligible students . . . based upon a weighted average," which he calculated to be 66%, rather than on student-specific documents establishing Medicaid eligibility. A.486, 494, 496. His transportation-cost calculation was based solely on DCPS's programmatic costs, which he calculated to be $24.6 million, and not on calculations about the actual trips. A.485, 492. To determine the recoverable amount, he simply multiplied the total transportation costs ($24.6 million) by a 66% eligibility rate, to arrive at $16.2 million in allowable costs.

With respect to his cost report, Davis claimed to have "maintained appropriate and necessary original claim documentation for audit purposes."

Dkt.82 at 3-4; *accord* A.23.  The record, however, does not reflect precisely what documents Davis possesses.[7]

### d.     DCPS's rejection of Davis's cost report.

After receiving Davis's cost report, DCPS informed him that his report would not be submitted to MAA "because of the substantial amount of work that remain[ed] to be done on the project."   A.506.   The letter offered specific criticisms, including that the report "include[d] . . . costs that [we]re not reimbursable through Medicaid."  A.506.

Two months later, on August 19 and 24, 1999, Davis met with DCPS in anticipation of an audit of DCPS's interim reimbursement requests.   A.624. Following that meeting, on September 24, 1999, Davis reassured DCPS that all necessary "data" was "present and accounted for with respect to billing and cost documentation" for these Medicaid reimbursement requests, with the important exception of the progress notes documenting that services had been provided to Medicaid-eligible students.  A.624.  Davis relayed that DCPS had made him aware that "there may be an issue of individual student progress notes."   A.624. Notwithstanding his allegations here, at the time, Davis rejected the proposition

---

[7]     Davis has repeatedly refused to return the DCPS records containing confidential student educational, medical, and identifying information, which he contends supports the interim claims he filed and his cost calculations.  A.24-25; Dkt.29-1, 78-15, 90-6.

13

that it was his, rather than DCPS's, responsibility to keep progress notes reflecting services provided to children for audit purposes. A 624-25. He advised DCPS that having insufficient progress-note support in the records DCPS retained could adversely affect the audit. A.624-25.

### e. The Maximus cost report.

DCPS did not submit Davis's cost report to MAA. Dkt.82 at 4. Instead, DCPS submitted Maximus's cost report for school-based medical services to MAA on January 12, 2000, and Maximus's cost report for transportation sometime thereafter. A.285, 294, 339, 341, 373, 628-31; Dkt.78-2 at 15. The Maximus cost reports reflected approximately $69.5 million in total reimbursable costs, but only sought approximately $9.9 million in additional FFP for medical services and $1.7 million for transportation, or a total of $11.6 million, which was approximately $21.7 million less than Davis indicated the District was owed. App. 378, 552-53; Dkt.82 at 4.

Maximus's transportation cost calculation differed significantly from Davis's. Like Davis, Maximus first identified DCPS's total special-education transportation costs, which it calculated at $26.2 million, compared to Davis's $24.6 million. A.380, 492. But Maximus determined the total reimbursable transportation cost to be $4.3 million, not $16.2 million like Davis did. A.379, 492. Maximus's reimbursable cost was not simply the total special-education

14

transportation costs multiplied by an extrapolated, weighted percentage of Medicaid-eligible students, as was Davis's.  A.492.[8]  Instead, Maximus determined the round trip rate ($52.09) based on the total transportation expenditures, actual number of Medicaid eligible students (2,795), and the number of school days (180).  A.380.  The Maximus transportation cost report did not, as Davis asserts here, "present claims for transportation services," "summariz[e] the claims being presented," or contain "student-specific entr[ies]," Br. 8, 13, but rather contained a summary of the costs associated with providing transportation for Medicaid-eligible special education students.  A.385-403.  After determining the cost-based round-trip rate, Maximus applied this rate to the number of health-related service claims (82,615) that it determined had been filed in FY1998, multiplying to arrive at the $4.3 million figure.  A.380.  The FFP for that $4.3 million was $3 million (70%), well below the $11.4 million Davis said the District was owed.  A.380, 492.

According to the Maximus report, Maximus had a roster of students who were authorized to receive Medicaid-reimbursable transportation services, as well as a paid claims history report reflecting the interim reimbursement sought by Davis—claims Davis contends are supported by the DCPS records in his possession.  A.377; Dkt.107, 107-1.  The Maximus report reflected that DCPS had

---

[8]     Davis appears to disavow his transportation-cost methodology here, in favor of Maximus's approach.  Br. 5-6, 16.

15

received $1.3 million in interim transportation reimbursements, and sought an additional $1.7 million in FFP.  A.379.

**f.      MAA's initial settlement of the FY1998 reimbursement.**

After receiving the Maximus costs reports for school-based medical services and transportation, MAA made a tentative settlement payment to DCPS of approximately $10.3 million in additional FFP.  A 298, 306; *see* 42 C.F.R. § 413.64(f)(2) (2000) ("[A]n initial retroactive adjustment will be made as soon as the cost report is received.").  The record does not reflect how MAA arrived at the $10.3 million settlement figure, which was less than the $11.6 million the District sought, or whether it includes any part of the $1.7 million in transportation reimbursement sought and, if so, how much.  A.306; *cf.* 42 C.F.R. § 413.64(f)(2) (2000) ("[T]he costs will be accepted as reported, unless there are obvious errors or inconsistencies, subject to later audit.").

**g.      Davis's complaints to DCPS about the Maximus report.**

After Davis learned that DCPS had submitted the Maximus report, Davis contacted DCPS to inform it that it had "no documentation" to support the costs reported, and it had not requested the full amount owed to DCPS.  A.23.  He reiterated these concerns on later occasions.  A.23-24.  Davis also alleged that District officials admitted to him that they had submitted the cost reports knowing

16

that they did not physically possess the documentation to support the reimbursement request.  A.24-25.

### h.    The independent review of Maximus's cost reports.

After receiving Maximus's two cost reports, MAA submitted them to its independent auditor, Bert Smith & Company ("Bert Smith").  Dkt.78-2 at 5-6. Bert Smith reviewed DCPS's cost claims for FY1996 through FY1998.  A.294, 306; Dkt.78-2 at 5, 78-14 at 6.  As Bert Smith explained, when reviewing a cost report, auditors will select a sample of items to test and then review the supporting documentation for the cost claim.  A.259-60, 271, 293, 295, 299; Dkt.78-2 at 16. Cost items that are not supported by appropriate documentation are disallowed and the reimbursable Medicaid cost is adjusted.  A.293, 300.

According to Davis, there are two types of documentation that the District was required to physically possess when it submitted its transportation cost report: "cost" documentation and "service" documentation.  A.430.  Davis defines "cost" documentation as "data showing the provider's actual expenditures in providing medical services."  A.430.  According to Davis, "service" documentation "consists of an 'encounter form' prepared by the person performing the services and identifying the provider, student, service, date, and duration, signed by the provider."  A.431.

17

Bert Smith auditors spent two years reviewing and testing the cost and service information submitted by DCPS.  A.271, 277, 295, 297, 299-301, 329; Dkt.78-2 at 16; Br. 24.  Bert Smith reviewed student files for service information. A.271, 295, 297, 299-301, 319, 325; Dkt.78-2 at 16; Br. 24.

The largest portion of disallowed costs—nearly $59 million—had nothing to do with transportation.  Instead, it was associated with Prospect School's claims that were made outside the two-year filing limitations period and for which Davis *had not* sought interim reimbursements and for which the District (and Davis) lacked supporting documentation.  A.319; Dkt.78-12.[9]  With respect to the remaining cost items, the difficulty was not that the District possessed "no" client-specific service documentation or cost documentation supporting the 399,960

---

[9]      CMS accountant Helmut Altneder explained in his memorandum to Bert Smith partner Dorothy Page Proctor:

> The auditors advised that DCPS had included in their cost reports the costs of services that had never been billed on an interim basis.

> I made everyone aware of the Federal rule barring payment of FFP for claims submitted to the Federal government more than two years after the expenditures were incurred by any State agency. . . .  Further discussions with school officials in that meeting and after . . . revealed that DCPS did not have documentation for the individual service claims that allegedly made up the multi-million dollar cost items at issue . . . .  The fact that such documentation . . . was lacking, was the very reason DCPS had not billed for the services on an interim basis.

Dkt.78-12.

interim claims submitted by Davis (Br. 9), but rather that *some* supporting

information was not available.  A.271, 277, 299-301; Dkt.78-2 at 16.[10]

Bert Smith did not perform a full-scope audit, examining each of the

399,960 individual interim claims for service-specific documentation, but rather

conducted a review with agreed-upon procedures that focused on the actual cost of

providing various services.[11]  A.212, 302, 329.  In addition to reviewing the overall

cost for a particular DCPS-provided service, however, Bert Smith auditors also

reviewed some individual claims, spot-checking student files for notations showing

---

[10]     Davis's assertion that "there was no supporting data for the claims in the 1998 cost reports" has no support in the record, including the parts he cites.  Br. 9 (citing A.277 ("DCPS was unable to produce *all* the requested information." (emphasis added)), 579-96 (reflecting that actual "data" was provided by DCPS)). Likewise, Davis's assertion that it is "undisputed that DCPS did not have the student-specific documentation to show that medical services were actually provided" (Br. 16-17) is refuted by the District's challenges below and the summary judgment evidence disproving it.  A.259-60, 271, 293, 299-301, 319, 325, 453, 458-59, 471, 479, 624-25.

[11]     CMS found that:

> For the last two years the auditors have been engaged in a long process of reviewing and testing the original cost information submitted by DCPS and requesting and evaluating additional, more detailed information when it was provided.  However, DCPS [has] not been able to produce all the requested information, and the auditors have been unable to perform some of their usual steps.

A.329.  CMS characterized DCPS's *cost* information as lacking "specificity" and being "incomplete and insufficiently detailed," not nonexistent.  A.330.  Moreover, CMS did not find that DCPS lacked documentation for each medical service provided.  A.330.  Rather, it indicated that service document testing had not been performed.  A.330.

that services were provided, as well as reviewing the billing records. A.259-60, 271, 295, 297, 299-301; Br. 24. This type of review was undertaken at MAA's request and with CMS's approval. A.301-02, 309, 330. But, because DCPS was unable to produce *all* of the requested cost documentation, the auditors were not able to adhere to all of their usual audit steps. A.277, 329.

Bert Smith completed its review and submitted its final report to MAA at the end of 2001. Dkt.78-14 at 6. For FY1998, the auditors identified $42.6 million in reimbursable costs. A.308-25. Bert Smith determined that portions of DCPS's FY1998 medical service reimbursements in Maximus's January 12, 2000, Special Education Cost Settlement should be disallowed because DCPS lacked supporting documentation. A.308-19. The auditors ultimately recommended that $7.6 million in FFP that DCPS had received as interim payments be returned to CMS for FY1998 for disallowed medical costs. Dkt.49-5 at 2; A.277-78, 331.

Bert Smith reached the opposite conclusion with respect to the transportation cost report. The Bert Smith transportation cost report contained twelve line-item service costs, such as employee "salaries and benefits," "maintenance and repairs," and "fuel." A.324. Bert Smith made adjustments to just three of these items, which resulted in an initial downward adjustment in DCPS's total transportation costs from $26.2 million to $23.8 million. A.324-25. The monetary reductions were based upon the lack of supporting cost documentation for fuel, miscalculated

20

indirect costs, and the usage of transportation services by non-special education students.  A.325.  Of the $23.8 million in total costs, however, Bert Smith determined that the allowable costs for Medicaid reimbursement totaled $9.5 million, more than *twice* the $4.3 million identified by Maximus.  A.323, 379.  The FPP based on Bert Smith's calculation was $6.68 million (70% of $9.54 million)— again, more than twice the $3 million Maximus sought on behalf of DCPS.  A.379.

Bert Smith identified 199,980 Medicaid eligible claims for transportation reimbursement.  A.212, 325.  Bert Smith reduced the number of those claims by 900, or less than one half of 1%, because student IEPs were not provided during the audit.  A.325.  Even then, Bert Smith identified more than twice as many interim Medicaid-reimbursable claims than the 82,615 claims Maximus identified. A.212, 323, 380.

In 2002, MAA advised CMS that it was having difficulty determining the final settlement amounts for DCPS services in FY1996 through FY1998 because the *cost* information from DCPS was not complete.  A.277, 328.  In response to MAA's concerns, CMS completed, in February 2003, an onsite financial review of the FY1996-1998 Medicaid cost settlements for DCPS.  A.278, 330.[12]  There is no

---

[12]     Davis inexplicably characterizes CMS's "day and a half" examination of Bert Smith's procedures and work papers (A.330) as a "super-audit."  Br. 9, 26. CMS characterized its review as "brief."  A.329.  Davis's suggestion that CMS

indication that CMS reviewed Bert Smith's transportation cost assessment as there is no mention of either Maximus's or Bert Smith's transportation cost settlements in the CMS report—the report only references the three school-based clinic providers: the Lee, Sharpe, and Prospect Schools.  A.329; *see also* A.269, 275, 295.  Even then, the only service documentation CMS found lacking was for "cost items[] which had not been previously claimed under the interim rate procedures established."  A.328; *see supra* note 9.

In any event, the purpose of CMS's review was to examine the auditors' work and determine whether their revised proposed settlements complied with the District's State Health Plan and federal regulations.  A.329-30.  After conducting its review, CMS issued a report in August 2003, concluding that "[g]iven the incomplete and insufficiently detailed cost information, the auditors applied sensible, practical testing and conservative judgments to determine allowable Medicaid costs."  A.330.  Ultimately, CMS concluded that the auditors' proposed final settlements were "reasonable."  A.330.  CMS requested that MAA finalize the cost settlements proposed by the auditors and refund the lump-sum FFP overpayment to CMS.  A.331.  MAA authorized the refund on March 29, 2004.  Dkt.49-5 at 2; 88-12 at 3; A.278.

---

expended an inordinate amount of effort and resources when reconciling the District's FY1998 transportation cost report (Br. 25-26) has no record support.

### 3.     The District Court's Decision.

The district court found that Davis's claims related to the FY1998 Special Education Cost Settlement for school-based services at the Lee, Sharpe, and Prospect Schools were barred by the FCA's six-year statute of limitations.   31 U.S.C. § 3731(b)(1); A.705-10.   The medical-services cost report was filed with MAA on January 12, 2000, and Davis did not file suit until April 4, 2006, more than six years later.   A.3, 339.   Davis does not challenge the statute-of-limitations bar to these claims, leaving only the question whether the District's FY1998 transportation costs settlement report, for which the precise filing date is unknown, constituted a false claim.

As to this report, the district court granted Davis's motion for summary judgment.   The district court found that the District knowingly submitted a false claim to the government by falsely certifying, impliedly, that District had physical possession of documentation to support its transportation-cost reimbursement request when the cost report was filed.   A.710-20.   The district court found, in relevant part, that it was "not disputed" that the District lacked "relevant documentation" supporting the transportation cost report and that physical possession of the documentation was "material" to CMS's decision to reimburse

the District for transportation costs.[13]   A.713, 717-18.   The court found "no evidence" that the District retained "*physical* possession" of any documentation supporting the cost report.  A.718.  The court, in turn, found that the District acted knowingly because it submitted the report "despite" Davis's "warnings" that it did not have "any" documentation supporting its transportation cost report in its possession.  A.719.

As for the penalty, the district court determined that the District committed one fraudulent act when it presented its year-end transportation cost report, which contained a single implied false certification, assessing an $11,000 fine.  A.722-24. The district court found that while "DCPS committed a fraudulent act when it presented year-end cost settlement reports for payment, despite the lack of supporting documentation," it had not done so "every single time an interim claim was paid during each fiscal year."  A.723.  The district court also found that given the fact that the federal government suffered no harm, Davis's construction of the

---

[13]     These issues were disputed by the District, with relevant citations to the record.  *See*, *e.g.*, A.453, 462 n.14, 471-73, 478-80.  Davis recognized as much in his statement of undisputed material facts, asserting that the District's concession was much narrower—that it "lacked service documentation *for at least some portion* of the FY96-FY98 Medicaid claims."  A.232 (emphasis added); *accord* A.421.  Regardless of whether the District retained all service documentation in support of the school-based medical services for the Lee, Sharpe, and Prospect Schools, the District maintained below, as it does here, that "Davis has failed to produce any evidence showing that the District did not maintain documents supporting the transportation cost report."  A.459.

term "claim" and his request for nearly $1 billion in civil penalties would lead to an absurd result.  A.723.

## STANDARD OF REVIEW

This Court reviews a summary judgment determination *de novo*.  *Tate v. District of Columbia*, 627 F.3d 904, 908 (D.C. Cir. 2010).  Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is "material" if its resolution might affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*.

In determining whether summary judgment is appropriate, this Court neither weighs the evidence nor determines the credibility of witnesses.  *Id*. at 249. Instead, the Court views the evidence in the light most favorable to the non-moving party, drawing all justifiable inferences in his favor.  *Id*. at 255.  In doing so, the Court "will not ignore facts in the record merely because they are unfavorable to [the non-movant]; [the non-movant] gets the benefit of the doubt only if the record contains competent evidence on both sides of a factual question." *Patel v. Allstate Ins. Co*., 105 F.3d 365, 367 (7th Cir. 1997).

A plaintiff opposing summary judgment may not rest upon mere allegations, but must affirmatively set forth specific evidence showing a genuine issue for trial. *Anderson*, 477 U.S. at 256. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The possibility that a jury might speculate in the plaintiff's favor is insufficient." *Haynes v. Williams*, 392 F.3d 478, 485 (D.C. Cir. 2004).

## SUMMARY OF ARGUMENT

1. The District, not Davis, is entitled to judgment as a matter of law. Precedent establishes that, to prevail on his false certification theory, Davis had to show three things: the District falsely certified compliance with a regulation; compliance was an express condition of payment, or at least material to the government's decision to pay; and the District knew that it violated a regulation and knew that compliance was a condition of payment. Davis failed to satisfy any, let alone all, of these essential elements.

*First*, the implied certification was not false. Davis's claim here is that the District impliedly certified that it had *physical possession* of supporting documentation when it submitted its transportation cost report. But the record

26

refutes his contention that the District possessed "no" or lacked "any" supporting documentation. When it submitted its transportation cost report, the District possessed "cost" documentation supporting its claim for additional FFP. The Maximus report establishes this, and the District produced cost documentation during discovery.

Likewise, the District possessed "service" documentation. Davis admitted as much in contemporaneous communications with the District regarding its retention of IEP progress notes in its student files—documents sufficient for audit purposes. In addition, several witnesses testified that Bert Smith reviewed service documentation as part of its audit. This is reflected in the Bert Smith cost report, which shows minimal adjustments based on missing student IEPs. Moreover, nothing in CMS's report suggests that the District lacked service documentation for its transportation cost report. Davis's claim that the District lacked "any" cost or service documentation thus fails.

Likewise, Davis has not shown that the documentation the District did possess was insufficient to support its claim. The Bert Smith auditors' review of the District's records found supporting documentation for more than twice the FFP the District had sought. The record is clear that the District had "some" supporting documentation and requested only "some" of the FPP to which it was entitled.

Davis has failed to carry his burden to prove that the District lacked documentation for the claim it actually made.

*Second*, the regulations upon which Davis relies do not expressly require physical possession of service documentation nor do they condition payment on such possession.  Davis, moreover, has failed to show even that the lack of supporting documentation was material to CMS's decision to pay additional FFP. When CMS accepted Bert Smith's reimbursement recommendation, CMS was aware of the state of the District's records and paid DCPS more than *twice* the FFP it had sought.  This decision is particularly significant given the considerable discretion CMS has in fashioning remedies for regulatory violations that Davis here seeks to supplant.

*Third*, Davis's evidence that the District knew that he had physical possession of the District's service documentation is insufficient.  The District had every reason to believe when it filed the cost report that Davis would return the service documents he claims to have.  Davis did not advise the District about his retention of the records until *after* it submitted the report.  Nevertheless, the documents at issue belong to the District, and Davis has not shown that the District's belief that it was in compliance with the Medicaid regulations was unreasonable or evinced a reckless disregard for the truth.

28

2.  If there was an implied false certification in the transportation cost report, it constituted a single false claim that does not support Davis's astounding request for nearly $1 billion in civil penalties.  The FCA's plain language supports the District.  A "claim" is a request or demand for money.  The District's transportation cost report was a single request for payment seeking a fixed sum of money.

Focusing on the District's actions also establishes there was only one false claim.  A single impliedly false certification in a cost report constitutes a single violation of the FCA.

The district court was thus correct to reject Davis's argument that the District was liable for 82,615 separate civil penalties.  The validity of the 82,615 interim claims for transportation reimbursement is in fact not at issue.  Davis's contention that those claims were submitted for payment upon filing of the cost report is simply incorrect.  The cost report establishes the cost of providing the services for which the District has already submitted claims for payment.  There is no authority for Davis's contention that a false certification in a cost report implicates the validity of previously submitted, interim claims for payment.  Indeed, the authority is to the contrary.

The district court was also correct to consider the potential size of the resulting penalties—$908 million—when determining the number of claims.  This is a relevant consideration in the Medicaid context where a relator could demand

damages far in excess of the value of Medicaid services provide, undermining CMS's remedial authority and effectively destroying the provider's ability to provide services to the financially disadvantaged. Indeed, such an astronomical award implicates constitutional considerations given Davis's concession that the government suffered no actual damages. The Court should adopt the district court's reading of the FCA, which avoids any constitutional issue and accords with its text and common sense.

At minimum, Davis's request for 82,615 civil penalties fails for a lack of proof. Davis has not shown that District lacked physical possession of supporting documentation for any particular one of the interim claims, let alone all 82,615.

## ARGUMENT

### I.    The District Is Entitled To Summary Judgment On The Question Whether The District Submitted A False Claim To The Government.

The district court erred by granting summary judgment to Davis on the question whether the District submitted a false claim for Medicaid reimbursement. Rather, the District is entitled to judgment because, when the evidence is viewed in the light most favorable to Davis, the record demonstrates that Davis has failed to establish *any*, let alone all, of the essential elements of his claim. Alternatively, the district court's judgment should be vacated because, when the evidence is viewed in the light most favorable to the District, there are, at a minimum, genuine disputes of material fact that foreclose summary judgment in Davis's favor.

30

**A.      Davis's implied false-certification theory of FCA liability requires him to show first that the District falsely certified that it had physical possession of documents supporting its transportation cost report; second that physical possession was a condition for reimbursement; and third that the District knew as much.**

1.      The law.

There are two types of false claims under the FCA—factually false claims and legally false claims. *United States ex rel. Conner v. Salina Reg'l Health Ctr.*, 543 F.3d 1211, 1217 (10th Cir. 2008). Factually false claims are straightforward. The relator must show the defendant submitted an incorrect description of the goods or services provided or sought payment for goods or services that were not provided. *Id.*; *United States ex rel. Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001); *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1266 (D.C. Cir. 2010) ("*SAIC*"). This case does not involve a factually false claim. Davis has conceded that the District sought nothing more than reimbursement for the actual costs incurred for Medicaid-eligible services that were in fact provided. *Davis*, 679 F.3d at 840.[14]

Instead, Davis contends that the District submitted a legally false claim. To establish a legally false claim, the relator must show that the defendant certified

---

[14]      Davis's suggestions here that the figures in the District's transportation cost report were "inflated"; the government suffered "unrecoverable losses"; and the District received reimbursements to which it was not entitled, Br. 11, 16, 24, are nothing more than thinly veiled attempts to resurrect the actual damages claim that was rejected as conceded and laid to rest by this Court in its prior decision.

compliance with a statute or regulation while knowing that it had failed to comply with that requirement. *Conner*, 543 F.3d at 1217; *SAIC*, 626 F.3d at 1266.

As this Court and others have recognized, however, a false-certification theory applies only where compliance with the underlying regulation is a condition of payment. *United States ex rel. Hobbs v. Medquest Assocs., Inc.*, 711 F.3d 707, 714 (6th Cir. 2012); *Conner*, 543 F.3d at 1217; *United States ex rel. Siewick v. Jamieson Sci.& Eng'g, Inc.*, 214 F.3d 1372, 1376 (D.C. Cir. 2000); *SAIC*, 626 F.3d at 1266; *Mikes*, 274 F.3d at 697. Thus, in the Medicaid context, a false-certification claim depends on whether it is based on conditions of participation—which are not grist for FCA claims but rather are enforced through administrative mechanisms—or conditions of payment. *Hobbs*, 711 F.3d at 714; *Conner*, 543 F.3d at 1220.

A legally false certification claim can be either express or implied. *Conner*, 543 F.3d at 1217; *Hobbs*, 711 F.3d at 714. In the case of an express false certification, the defendant has signed or expressly certified compliance with a law or regulation on the face of the claim that has been submitted. *Hobbs*, 711 F.3d 707. The District's transportation cost report did not contain an express certification of compliance. Instead, Davis relies on a theory of implied false certification.

An implied false certification does not turn on the defendant's actual statements. *Conner*, 543 F.3d at 1218. Instead, courts look to the underlying contracts, statutes, or regulations to determine whether they make compliance a prerequisite for payment. *Id.* "An implied false certification claim is based on the notion that the act of submitting a claim for reimbursement itself implies compliance with governing federal rules that are a precondition to payment." *Mikes*, 274 F.3d at 699.

In the context of Medicare and Medicaid, an "implied false certification is appropriately applied only when the underlying statute or regulation upon which the plaintiff relies *expressly* states the provider must comply in order to get paid." *Mikes*, 274 F.3d at 700 (emphasis in original); *see also United States ex rel. Steury v. Cardinal Health, Inc*., 735 F.3d 202, 207 (5th Cir. 2013). But, even under the less onerous "materiality" standard, *SAIC*, 626 F.3d at 1269, "[i]f the government would have paid the claims despite knowing that the contractor has failed to comply with certain regulations, then there is no false claim for purposes of the FCA."[15]  *Conner*, 543 F.3d at 1219-20; *accord United States ex rel. Wilkins v.*

---

[15]    *SAIC* does not preclude adoption of an "express condition" requirement here. This Court there rejected, in the distinct context of contractual conditions, a requirement that the contract expressly condition payment on compliance with the contract term before non-compliance could give rise to FCA liability. 626 F.3d at 1269. Instead, the Court adopted a "materiality" standard—that compliance with

33

*United Health Grp., Inc.*, 659 F.3d 295, 307 (3d Cir. 2011); *see SAIC*, 626 F.3d at 1271.

The FCA only sanctions false claims that are made "knowingly."  31 U.S.C. § 3729(a)(1).  It defines "knowing" and "knowingly" to mean that a person has actual knowledge of the information; acts in deliberate ignorance of the truth or falsity of the information; or acts in reckless disregard of the truth or falsity of the information, whether or not there is an intent to defraud.  31 U.S.C. § 3729(b)(1). Establishing knowledge on the basis of an implied certification requires the plaintiff to prove that the defendant knew (1) that it violated a regulation and (2) that its compliance with that regulation was a condition of payment.  *SAIC*, 626 F.3d at 1271.

  2. Davis's claim.

Davis contends that the District made an implied false certification regarding service-supporting documentation when it submitted its FY1998 transportation cost report.  The *existence* of adequate documentation supporting the District's interim claims for transportation reimbursement is not disputed.  Davis maintains

---

the contractual requirement in question was material to the decision to pay.  *Id*. at 1271.  While doing so, however, the Court recognized that the express-condition requirement adopted by the Second Circuit in *Mikes* arose in a "substantially different situation"—claims by medical providers under the Medicare guidelines, which implicated concerns that were not present in a case involving regulatory requirements incorporated into a contract.  *Id*. at 1270.

that he has audit-quality service documentation supporting the full amount of Medicaid reimbursement reflected in the FY1998 cost reports for the 399,960 interim claims he prepared.  A.23-24, 428, 624-25; Dkt.82 at 3.  Thus, the question is not whether there is supporting documentation for the District's claims or whether the District falsely certified that the documentation existed.  Instead, the factual predicate for Davis's claim is much narrower—that at the time the District submitted its FY1998 transportation cost report, the District did not have *physical possession* of the supporting documentation because that documentation was in his hands.  *See* A.415, 711.

Therefore, to succeed on his theory of implied false certification, Davis must show that when the District submitted its FY1998 transportation cost report it impliedly and falsely certified that it had physical possession of supporting documentation; physical possession of the documentation at the time the cost report was submitted was an express prerequisite or a material condition for Medicaid reimbursement; and the District knew at the time it submitted the transportation cost report that it did not have physical possession of service documentation and such possession was a condition of payment for the additional FFP it sought.  *See* A.415.

Davis's claim fails on each of these three independent elements.  The implied certification was not false; the implied certification was not an express

35

prerequisite or material condition for payment; and the District did not act with the requisite scienter.  Thus, the District is entitled to summary judgment on the question whether it made an implied false certification.  Or, at the very least, judgment in Davis's favor should be vacated.

**B.    The implied certification was not false; Davis has not shown, and cannot prove, that the District did not physically possess supporting documentation for its transportation cost report.**

1.    An essential predicate underlying Davis's FCA claim—that the District had "no," or lacked "any," documentation to support its transportation cost report—is refuted by the evidence.

Davis's claim, as pled in his amended complaint, is predicated upon his contention that the District lacked *any* documentation to support its FY1998 transportation cost report.  Dkt.82 at 4, 7; A.23-24; Br. 9.  Davis's contention that the District lacked "any," or had "no," documentation for its transportation cost report is refuted by the summary judgment evidence, which demonstrates that the District possessed both transportation cost- and service-related documentation when it filed its FY1998 transportation cost report.

a.    Cost data.

At the time it submitted its transportation cost report, the District possessed cost documentation supporting its claim for additional FFP.  The Maximus transportation cost report demonstrates as much.  A.382-404.  The report details the cost information (that is, "data showing the provider's actual expenditures in

36

providing medical services," A.430) available to Maximus and much of that information was appended to the report. A.382-404. In particular, the Maximus transportation cost report reflects that it was prepared using reports generated by DCPS's "automated accounting and personnel systems"; the authorized student transportation roster; and the paid claims history showing the number of interim claims paid for Medicaid eligible students, among other things. A.382-404. Indeed, the District produced 775 pages of supporting transportation cost documentation during discovery. Dkt.107 at 2 n.3, 107-1. Thus, there can be no claim that the District had "no," or lacked "any," cost documentation for its transportation cost report.

> b.    Service documentation.

In apparent recognition that the District was not lacking the necessary cost documentation, and thus had some, rather than "no," documents to support the claim for additional FFP, Davis shifted his theory of falsity in the district court. In his motion of summary judgment, Davis argued that the District's claim was false because it lacked the *service* documentation—"encounter forms"—necessary to support its claim. A.415, 427, 430, 659-61, 665-69; Br. 8. But this contention is also refuted by the summary judgment record. The record is replete with evidence that the District had service documentation in its possession to support its FY1998 transportation cost report, disproving Davis's conclusory assertion to the contrary.

*See Greene v. Davis*, 164 F.3d 671, 675 (D.C. Cir. 1999) (holding that conclusory statements that lack supporting facts cannot defeat a summary judgment motion).

*First*, in contrast to his allegations below, Davis made clear in his contemporaneous communications with DCPS that, for audit purposes, it was DCPS's responsibility, rather than his, to maintain IEP progress notes in student files "to reflect a review of the IEP and the services provided for the child." A.624. According to Davis, it was DCPS who made him aware before the Bert Smith audit that "*some* DCPS providers may not have kept progress note[] documentation sufficient for audit purposes."[16] A.624 (emphasis added). Davis's contention that the District had no service encounter forms because he had collected them is refuted by his own admission that supporting notes should be found in student files and IEPs maintained by DCPS.

*Second*, the witnesses consistently testified that Bert Smith conducted a review of student-specific encounter documentation, and that the District had some service supporting documentation for the services provided to special-education students. Heather McCabe, who was an MAA employee during Bert Smith's review of DCPS's FY1998 cost reports (A.255), testified that Bert Smith extracted

---

[16]     Progress notes in student files and medical records are sufficient for CMS audit purposes. A.330.

a random number of students from the paid claims report and traced the claims to documentation for the provision of services.  A.259-60.

Likewise, Isaac Wood, a District accountant with a background in Medicaid reimbursement (A.263), testified that Bert Smith "took a sample, just like all audits," and tested the service data, during the course of its FY1998 review. A.271.  Wood indicated that DCPS had service documentation for "some" services, but did not have documentation "for others."  A.263, 271; *accord* 277 ("DCPS was unable to produce *all* the requested information." (emphasis added)).

Dorothy Page Proctor, a Bert Smith partner (A.292), likewise testified that Bert Smith reviewed encounter records when reviewing the Maximus transportation cost report.  A.297, 299.  She explained how Bert Smith conducted that review:

> We also looked at and pulled a sample of—we identified students, pulled a sample of who received transportation services.  We pulled a sample to look at the dates of service.  And from that information, we identified any exceptions to what was being claimed for reimbursement.

A.297.  Page Proctor further explained how the transportation claims were verified: "By pulling the transportation, you are identifying that a service was performed and the student was on the bus that day."  A.297.

The Bert Smith review also focused on whether the students receiving transportation services had been identified as special needs children.  A.297-98.

As a result of this review, Bert Smith made an adjustment to the transportation cost report to reflect that special education transportation services had been used by "non-special education students."  A.325.

In the end, Page Proctor indicated that the District had some service supporting documentation for its claims:

> Q. And that would be, as we talked about earlier, the delivery of a Medicaid service to a Medicaid-eligible student?
>
> A. Yes.
>
> Q. Now, was part of the auditing process for this particular period—we are talking about fiscal year 1998—to review such records?
>
> A. It was to review the student's files which have those records, yes.
>
> Q. And do you know whether in fact such files were reviewed with respect to the provider, that is, DCPS?
>
> A. Some were received and some were not.

A.299.

Page Proctor was also clear in her testimony that much of the missing service documentation was not related to transportation, but to school-based medical claims for which the District had requested reimbursement for the first time in its FY1998 Special Education Cost Settlement, although the services had been provided outside the two-year limitations period.  A.300, 302-03; *see also* Dkt.78-12.

40

*Third*, the Bert Smith transportation cost report itself confirms that Bert Smith reviewed individual student IEPs and other records to determine service eligibility, and made adjustments reflective of its findings—as Davis concedes here.  Br. 24-25.  The report indicates that Bert Smith "reviewed special education transportation enrollment data for accuracy and validity."  A.321. Moreover, Bert Smith made a minor adjustment to the number of "transportation days for students whose [IEP] was not provided," reducing the 199,980 of Medicaid student days by 900, or less than one half of 1%—a clear indication that Bert Smith looked at service documentation, not merely cost documentation, and disallowed only a small fraction of the claim based on the lack of service documentation.  A.323, 325.

*Fourth*, nothing in CMS's report indicates that the District lacked the necessary encounter forms to support its transportation cost report.  Instead, the CMS report indicates that there were problems with the cost data and service documentation for the school-based medical service claims for which the District was seeking reimbursement outside the two-years limitations period—claims related to the Lee, Sharpe, and Prospect Schools for which the District had not sought interim reimbursement—not the District's transportation cost report. A.328-29; Dkt.78-12.

41

The record demonstrates that Bert Smith spent *two years* reviewing cost *and* service documentation provided by DCPS to support its cost reports.  A.329.  The contention that the District had "no" documentary support in the form of cost or service documentation for its FY1998 transportation cost report is refuted by the record.  To the extent that Davis's FCA claim is predicated upon his claim that the report was false because the District lacked "any" cost or service documentation supporting Maximus's transportation cost report, it must fail.

      2.    Davis has not shown that the documentation the District did possess was insufficient to support its transportation cost report.

In addition to failing to show that there was "no" service documentation to support the transportation cost claim, Davis has failed to meet his burden to show that the service documentation the District did possess was insufficient to support its transportation-related claim for FFP.

Maximus identified $4.3 million in authorized Medicaid costs for transportation and indicated that the District was entitled to 70%, or $3 million, as FFP.  A.379.  The Maximus report reflected that DCPS had received $1.3 million in interim transportation reimbursements based on claims submitted by Davis, and sought an additional $1.7 million in FFP.  A.379.  The transportation cost calculation was based on 82,615 Medicaid student days.  A.380.  In contrast, Bert Smith determined that the District had incurred $9.54 million in Medicaid

allowable costs for 199,980 Medicaid student days, for a total FFP of nearly $6.68 million—twice what the District sought in its cost report.  A.323.

The record is clear that the District had "some" supporting documentation and requested only "some" of the FPP to which the Bert Smith auditors concluded the District was entitled after Bert Smith applied "conservative judgments" to arrive at a "reasonable" settlement of the District's transportation cost claim. A.330.  Even assuming that the District lacked some service transportation documentation, Davis has utterly failed to demonstrate that the District lacked supporting documentation for the claim it actually made: $3 million in FFP for 82,615 Medicaid student days.  This was part of his burden to show as plaintiff. *United States ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 714 (7th Cir. 2014).

Because Davis has not proven that the District's implied certification that it had retained service documentation supporting its transportation cost report was false, judgment should be entered for the District.  At the very least, as to Davis's motion for summary judgment, this evidence gives rise to a genuine dispute of material fact entitling the District to a trial on the ultimate question whether the alleged certification was impliedly "false" and so precludes summary judgment in Davis's favor.

43

**C.    The implied certification was not a prerequisite for, or material to, the payment decision, particularly where CMS was fully aware of the facts and paid in excess of the amount requested.**

        1.    Physical possession of service documentation was not an express condition for payment.

Davis relies on two regulations to support his assertion that the District made an implied false certification of compliance with a Medicaid regulation—42 C.F.R. §§ 413.20, 413.24 (2000).  A.430; Br. 6.  As the District asserted below (A.463), neither regulation expressly conditions Medicaid payment on physical possession of service documentation.

*First*, these regulations do not require physical possession of service documentation.  Instead, they require that providers "maintain sufficient *financial records* and *cost data* for a proper determination of costs payable under the program."  42 C.F.R. § 413.20(a) (2000) (emphasis added); *accord* 42 C.F.R. § 413.24(a) (2000) ("Providers receiving payment on the basis of reimbursable cost must provide adequate *cost data*. This must be based on their *financial* and *statistical records* which must be capable of verification by qualified auditors." (emphasis added)); A.420 ("Cost documentation consists of data showing the provider's actual expenditures in providing medical services.").

The regulation delineates the type of documents that must be maintained. There is no mention of "service documentation" or "encounter forms."  Rather, the focus is on financial and operational records:

44

The provider must permit the intermediary to examine such records and documents as are necessary to ascertain information pertinent to the determination of the proper of amount of program payments due. These records include, but are not limited to matters pertaining to—

(i)      Provider ownership, organization, and operation;

(ii)     Fiscal, medical, and other recordkeeping systems;

(iii)    Federal income tax status;

(iv)    Asset acquisition, lease, sale, or other action;

(v)     Franchise or management arrangements;

(vi)    Patient service charge schedules;

(vii)   Costs of operation;

(viii)  Amounts of income received by source and purpose; and

(ix)    Flow of funds and working capital.

42 C.F.R. § 413.20(d)(2) (2000).

*Second*, there is nothing in these regulations that expressly conditions payment on possession of service documentation. To the contrary, "[i]n order to reimburse the provider as quickly as possible, an initial retroactive adjustment will be made as soon as the cost report is received." 42 C.F.R. § 413.64(f)(2) (2000). For purposes of this adjustment, "the costs will be accepted as reported, unless there are obvious errors or inconsistencies, subject to later audit." 42 C.F.R. § 413.64(f)(2) (2000). Indeed, at this stage, "[a] cost report is rejected for lack of supporting documentation *only if* it does not include the Provider Cost

Reimbursement Questionnaire."   42 C.F.R. § 413.24(f)(5)(i) (2000) (emphasis added).

The regulations cited by Davis simply do not contain an express requirement that the District physically possess service documentation when it submits a cost report as a condition for payment of additional FFP. *See Gonzalez v. Fresenius Med. Care N. Am.*, 689 F.3d 470, 475-76 (5th Cir. 2012) ("[A]lthough the cost reports were a condition of Medicare participation and failure to submit accurate cost reports would trigger Medicare's remedial scheme, the cost reports would not cause payment to be withheld."); *Conner*, 543 F.3d at 1218-21 (holding that the *express* compliance certification for cost reporting mandated by 42 C.F.R. § 413.24(f)(4)(iv) is a condition of participation, not payment).

In accord with other courts of appeals, this Court should hold that Davis's FCA claim fails because he does not show any violation of a regulation conditioning payment. *Siewick*, 214 F.3d at 1376; *Hobbs*, 711 F.3d at 715-17; *Conner*, 543 F.3d at 1220-21. Such a holding would honor the text and purposes of the FCA, which "was not designed for use as a blunt instrument to enforce compliance with all medical regulations—but rather only those regulations that are a precondition to payment—and to construe the impliedly false certification theory in an expansive fashion would improperly broaden the Act's reach." *Mikes*, 274 F.3d at 699.

46

>2.     The purported lack of service documentation was not material
>to CMS's decision to provide the District with additional FFP.

In the absence of an express requirement that the District have service documentation in its possession, Davis would have to show at least that the lack of such documentation was material to CMS's decision to pay additional FFP. *Conner*, 543 F.3d at 1219-20; *Wilkins*, 659 F.3d at 307; *see supra* note 15. The record here is clear. *Cf. United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902-03 (5th Cir. 1997) (finding the record insufficient to determine "whether, or to what extent, payment for services identified in defendants' annual cost reports was conditioned on defendants' certifications of compliance").

When CMS made its decision to accept Bert Smith's reimbursement recommendation, CMS was aware of the state of the District's records and, according to Davis, knew that "no testing had been done to ensure that DCPS had documentation of every medical service that had been billed." A.420; *see* A.330. Notwithstanding this knowledge, CMS paid DCPS more than *twice* the FFP it had sought in the Maximus transportation cost report. Given these facts, the absence of supporting documentation was clearly not material to CMS's decision to provide additional Medicaid reimbursement to the District. But "a plaintiff must show that if the Government had been aware of the defendant's violations of the Medicare

47

laws and regulations . . . , it would not have paid the defendant's claims." *Wilkins*, 659 F.3d at 307; *see also Conner*, 543 F.3d at 1219-20.

Indeed, CMS's knowledge of the purported deficiencies in the District's recordkeeping at the time it made its payment decision makes application of the FCA in this case particularly inappropriate. "As several courts of appeals have held, . . . the implied certification theory of liability should not be applied expansively, particularly when advanced on the basis of FCA allegations arising from the Government's payment of claims under federally funded health care programs." *Wilkins*, 659 F.3d at 307. Doing so would ignore the extensive regulatory scheme that ensures compliance with Medicaid and Medicare laws and the considerable discretion afforded CMS in fashioning appropriate remedies for regulatory violations:

> To allow FCA suits to proceed where government payment of Medicare claims is not conditioned on perfect regulatory compliance—and where [CMS] may choose to waive administrative remedies, or impose a less drastic sanction than full denial of payment—would improperly permit qui tam plaintiffs to supplant the regulatory discretion granted to [CMS] under the Social Security Act, essentially turning a discretionary denial of payment remedy into a mandatory penalty for failure to meet Medicare requirements. *See* [*United States ex rel. Hooper v.*] *Anton*, 91 F.3d [1261, 1267 (9th Cir. 1996)] (where regulatory compliance is "not a *sine qua non* [for the] receipt of state funding" the FCA may not be used as a substitute for administrative remedies); [*United States ex rel.*] *Lamers* [*v. City of Green Bay*], 168 F.3d [1013, 1020 (7th Cir. 1999)] (qui tam plaintiff may not use the FCA to "preempt" a federal agency's "discretionary decision not to pursue regulatory penalties").

*United States ex rel. Swan v. Covenant Care, Inc.*, 279 F.Supp.2d 1212, 1222 (E.D. Cal. 2002).

> **D.    The implied false certification was not knowing.**

Davis argued, and the district court found, that the District acted knowingly because when the District submitted the transportation cost report it "had actual knowledge that it did not possess supporting documentation for the . . . cost report because [Davis] repeatedly informed District employees of the lack of documentation."  A.415; *accord* A.421, 719.  Davis's evidence that the District knew that he had physical possession of the District's service documentation proves far too little.  Instead, even assuming the record allowed a finding that he had *all* the service documentation and the District none, Davis must show that the District knew that physical possession of service documentation at the time the cost report was submitted was a regulatory requirement and a condition for payment, and that Davis's physical possession of the documents constituted non-compliance with the law.  *See SAIC*, 626 F.3d at 1271.  Davis has produced no such evidence.

As an initial matter, the communications from Davis upon which Davis and the district court relied to establish the District's actual knowledge occurred *after* the District submitted the Maximus transportation cost report, not before.  A.23-25. As the District maintained below, it had every reason to believe when it submitted

the transportation cost report that Davis would either return the student-specific documents belonging to the District—IEPs, medical records, and other provider-generated records made confidential by health-privacy laws—or produce them for an audit.  *See* A.24-25, 624-26; Dkt.29-1, 78-15, 90-6.

All indications from the record are that Davis is a bailee guilty of conversion—a disgruntled former agent of the District who held the District's records hostage for a number of years in an effort to secure a payment he believed was due under a contract with the District that had been terminated.  *See* A.24-25, 624-26; Dkt.29-1, 78-15, 90-6.  When those efforts failed, he filed this *qui tam* action at the eleventh hour based on his possession of the District's records in a game of "gotcha."  Assuming Davis has possession of the District's service documentation, Davis has not demonstrated that the District's belief that it was in compliance with the Medicaid regulations, notwithstanding his physical possession of the service documentation at the time the cost report was submitted, was unreasonable or evinced a reckless disregard for the truth.

The district court's rejection of the District's arguments on these points was erroneous.  A.714-15, 720.  Contrary to the district court's view, reliance on, or actual possession of, the service documentation was not necessary for Maximus to prepare a cost report.  A.714.  All Maximus needed to know to produce the report

was the number of interim claims that had been paid for Medicaid-eligible students and the actual cost of providing those services—information it indisputably had.

Likewise, the district court was incorrect to characterize the service documents at issue as belonging to Davis. A.714-15. The District has consistently maintained that the documents are the District's property, and Davis has not proven otherwise. *See* A.24-25, 461; Dkt.29-1, 78-15, 90-6. In asserting that it retained constructive possession of the records, the District was not arguing that Davis had an obligation to provide "audit support services" (A.663-65, 715), but rather an obligation to return property belonging to the District. A.461. Absent a showing that the District's belief that Davis was legally obligated to return the District's property upon termination of his contract was unreasonable, Davis's contention that the District "knew" that the cost report contained an implied false certification when it was submitted fails as a matter of law.

## II.    Even If The Transportation Cost Report Contained An Implied False Certification, Its Submission Amounted To One False Claim.

If the Maximus transportation cost report contained an implied false certification of compliance with a regulation, the District's cost report constitutes a single false claim. Davis's contention that the cost report somehow contains 82,615 false claims exposing the District to liability for *$908 million* in civil penalties fails as a matter of law.

51

**A.    The District's transportation cost report constituted a single claim under the plain language of the FCA.**

The FCA defines a "claim" as "any request or demand . . . for money . . . which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money . . . which is requested or demanded."  31 U.S.C. § 3729(c).  Applying the FCA's plain language, the District made a single request for payment from the government when it submitted its transportation cost report, seeking a fixed sum of money—$1.7 million in additional FFP.  This single demand for payment constitutes a single claim under the FCA.  A.378; *United States ex rel. Augustine v. Century Health Servs., Inc.*, 136 F.Supp.2d 876, 895 (M.D. Tenn. 2000) ("Here, each cost report filed by Century represents only one request for payment."), *aff'd*, 289 F.3d 409 (6th Cir. 2002).  If more were needed, decisions interpreting the meaning of a "claim" under the FCA, particularly in the context of Medicaid cost reports, provide additional support for the District's position.

**B.    The conduct at issue—making a single implied false certification—gives rise to only one false claim.**

Relying on legislative history, Davis contends that "in determining the number of claims, the focus should be on what is false about the request for payment."  Br. 14, *accord* Br. 17.  The Supreme Court has also emphasized that "[a] correct application of the statutory language requires . . . that the focus in each

52

case be upon the specific conduct of the person from whom the Government seeks to collect the statutory forfeitures." *United States v. Bornstein*, 423 U.S. 303, 313 (1976); *see also United States v. Krizek*, 111 F.3d 934, 939 (D.C. Cir. 1997) ("The Courts ask[], 'With what act did the defendant submit his demand or request and how many such acts were there?'").

Here, the district court granted summary judgment on Davis's claim based on an implied false certification theory.  According to Davis, when the District submitted its transportation cost report it impliedly and falsely certified that it had physical possession of student-specific supporting documentation for its claim. A.415.  This allegedly false certification was made once, when the cost report was submitted.  A single impliedly false certification constitutes a single violation of the FCA.  *See United States ex rel. Tyson v. Amerigroup Ill., Inc.*, 488 F.Supp.2d 719, 741 (N.D. Ill. 2007) (finding defendant "liable under the Federal FCA for the number of enrollment forms submitted to" a state agency, each of which contained an implied false certification).

### C.      Davis's efforts to turn a single purportedly false certification into 82,615 instances of fraud should be rejected.

In arguing that the district court should have assessed 82,615 penalties, resulting in a fine of up to $908 million, Davis fails to cite a single precedential authority for the proposition that a single implied false certification in a cost report can impugn 82,615 otherwise proper interim claims for reimbursement.  Instead,

53

he relies on cases that generally involve classic fraud scenarios of the type not presented here—cases that do not support his broad approach to calculating penalties.

Davis principally relies upon *United States ex rel. Roberts v. Aging Care, Inc.*, 2007 WL 4522465 (W.D. La. 2007), an unpublished district court decision. There, for five years, Aging Care compensated five physicians and billed Medicare for the services they provided to patients.  *United States ex rel. Roberts v. Aging Care, Inc.*, 474 F.Supp.2d 810, 814 & n.3 (W.D. La. 2007).   The government claimed that Aging Care's relationship with the physicians violated the Stark Act, 42 U.S.C. § 1395nn(a)(1), and the district court agreed.  474 F.Supp.2d at 818.  The court further found that Aging Care's annual cost reports contained express and implied certifications of compliance with the Act that were material to a payment decision.  *Id.* at 819.  The court subsequently awarded damages and penalties, "impos[ing] a fine of $5,500 for each false claim *contained in the 615 claims for payment* and the five false cost certification reports submitted for a total fine of $3,410,000.00" representing 620 false claims.  *United States ex rel. Roberts v. Aging Care Home Health, Inc*.   2007 WL 4522465 at *7 (emphasis added).   Nothing in the district court's decision, however, indicates that the penalties for "the 615 claims for payment" were based on the false certifications contained in the cost reports rather than the validity of the actual underlying claims for interim

54

reimbursement that independently violated the Stark Act when they were *separately submitted* for payment.  There is no support for Davis's assertion that "the court found that [the cost reports] contained 620 claims for payment, requiring 620 separate civil penalties."  Br. 17-18.

Likewise, *United States ex rel. Williams v. Renal Care Group*, 2011 WL 2118231 (M.D. Tenn. 2011), *rev'd on other grounds*, 696 F.3d 518 (6th Cir. 2012), did not involve calculating penalties based on a cost report containing a single implied false certification of regulatory compliance.  Instead, the validity of the underlying interim claims for payment was directly at issue.  *Id.* at *1.

These cases do not support Davis, but are consistent with decisions which have applied a single statutory penalty to cost reports containing an express or implied false certification, awarding additional statutory penalties related to underlying interim claims for reimbursement only where those interim claims were independently false or fraudulent when submitted.  *See*, *e.g.*, *Visiting Nurse Ass'n of Brooklyn v. Thompson*, 378 F.Supp.2d 75, 99 (E.D.N.Y. 2004); *United States v. Rogan*, 459 F.Supp.2d 692, 710-11, 728 (N.D. Ill. 2006), *aff'd*, 517 F.3d 449 (7th Cir. 2008); *United States v. Khan*, 2009 WL 2461031, *4 (E.D. Mich. 2009); *see also United States v. Bourseau*, 2006 WL 2961105, *14 (S.D. Cal. 2006), *aff'd*, 531 F.3d 1159 (9th Cir. 2008).

55

The Court's task here is not to determine "how many false claims were submitted at the outset for payment and reconciled in the cost reports," as Davis contends.  Br. 25.  He has conceded the validity of the interim requests for reimbursement he prepared and submitted for payment, and to the extent that he seeks to challenge those submissions for the first time now, his claims are barred by the statute of limitations.  All that is as issue here is the single implied false certification Davis claims the District made when it submitted its transportation cost report.

Davis attempts to distinguish the District's cases by asserting that none "dealt with a provider's request for reimbursement for multiple services rendered, or with multiple false entries on a single cost report."  Br. 19 n.2.  That assertion has no support.  There is no indication whatsoever that the cost reports submitted in these cases—cost reports governed by the same regulations as the District's transportation cost report—were materially different in content or function than the District's report at issue here.

Moreover, contrary to Davis's suggestion, rather than seeking reimbursement for individual, student-specific, itemized "services," or "multiple services rendered," the District's transportation cost report was based on the total programmatic costs for transporting special education students.  The line-item figures represented things such as payroll and benefits, operating expenses, and

56

indirect costs.  *E.g.*, A.385-87, 393-403.  As its name suggests, the cost report was a compilation of costs, not a reiteration of claims already established and paid. [17]

Davis does not contend that any single line-item cost figure in the District's report was inaccurate or fraudulent because the District did not incur the cost, inflated the cost, or lacked supporting documentation for the itemized expenditures.  Indeed, there was no allegation here, nor any proof, that there were "multiple false entries" in the District's transportation cost report.  Br. 19 n.2.

But even if Davis had alleged that a line-item entry in the transportation cost report was false, he would not be entitled to the relief he seeks.  As the Eighth Circuit has explained, a fraudulent line-item entry in a cost report does not give rise to civil penalties based on the number of interim requests for Medicaid reimbursement that had been made, but rather constitutes a single false claim:

---

[17]     At points in his brief, Davis appears to be operating under a misconception that the District did not submit individualized interim claims for each Medicaid beneficiary for payment by MAA during the fiscal year.  Br. 15, 21-22.  Davis's assertion that it would have been "impossible for DCPS to itemize each and every claim" and "impossible for MAA to process itemized claims for services and issue prompt payment" is without support.  Br. 15; *accord* Br. 21; *cf.* Br. 4; A.275-76, 295, 329, 418.  Moreover, the year-end cost reporting requirement was not "designed to address the administrative burden of processing thousands of claims . . . close in time to when the service was actually provided," Br. 21, but to ensure that the District was reimbursed for 100% of the cost of services provided to Medicaid-eligible special education students.  A.517.  Likewise, Davis cites nothing for the proposition that "the cost report is DCPS' presentment of the actual claims for services rendered to the students throughout the school year."  Br. 16.  His assertion is simply incorrect.

> Here, the misconduct was to purchase approximately $6,000 worth of apples, give them to employees during the holiday season, and then falsely claim Medicaid reimbursement for this expense. Medicaid reimbursement is a rate-based regime. A facility's historical costs are recorded on an annual cost report. [The state agency] then uses that report to calculate a payment rate or rates which are applied to all covered services over the following year . . . . *See* 42 U.S.C. § 1396a(a)(13)(A). Under this system, a one-time expense for a multi-facility provider may be reimbursed over hundreds or many thousands of claims for reimbursement of services provided to individual residents. Under [the relator's witness's] analysis, this protracted method of government reimbursement produces a $1,000,000 penalty (200 claims times $5,000 per claim) that bears no rational relationship to the false claim misconduct—seeking improper reimbursement for spending $6,000 to purchase apples. Thus, we reject layman [his] approach to deciding a legal question laced with Excessive Fines Clause implications.

*Hays v. Hoffman*, 325 F.3d 982, 993-94 (8th Cir. 2003) (citations omitted). Davis offers no reasoned basis to treat the single alleged implied false certification made here any differently.

Davis's reliance on authority related to the Civil Monetary Penalties Law in the Social Security Act, 42 U.S.C. § 1320a-7a, does not alter this conclusion. Davis asserts that in the context of these administrative proceedings, "claims are tallied based on the services or line-item entries in a cost report that are false, as opposed to the number of cost reports actually submitted," emphasizing that the falsity of "any entry in the cost report" gives rise to a false claim. Br. 19-20 (emphasis omitted). Again, here, Davis has identified only one purported falsity in the District's transportation cost report—an implied false certification that the

58

District physically possessed supporting service documentation for its cost report when it was filed.  He has failed to point to any other entry on the face of the District's transportation cost report that is false.  Rather than supporting Davis, the Civil Monetary Penalties Law cases demonstrate, like *Hays*, that a single false entry in a cost report does not impugn the validity of the underlying interim claims for reimbursement.  *Horras v. Leavitt*, 495 F.3d 894, 902 (8th Cir. 2007) ("Each entry on the home office cost reports results in 'an application for payment for items and services' under the CMPL."); *Chapman v. U.S. Dept. of Health & Human Servs.*, 821 F.2d 523, 525 (10th Cir. 1987) ("These four reports, one for each of the four nursing homes owned by Chapman, contained nineteen false line item cost entries for items and services purportedly provided by the nursing homes.").

Likewise, there is no merit to Davis's contention that the district court erred by considering the potential size of the resulting penalties—$908 million—when determining the number of claims.  *See Krizek*, 111 F.3d at 940 (rejecting the government's definition of a claim that permitted it to seek an "astronomical" $81 million worth of damages for alleged actual damages of $245,392).  Instead, it is a highly relevant consideration in the Medicaid context, particularly where, as here, CMS has exercised its discretion to pay the claim:

> [C]onsider if Conner's view of the certification were correct. An individual private litigant, ostensibly acting on behalf of the United

59

> States, could prevent the government from proceeding deliberately through the carefully crafted remedial process and could demand damages far in excess of the entire value of Medicare services performed by a hospital. If successful, the consequences of such an action would likely be catastrophic for hospitals that provide medical services to the financially disadvantaged and the elderly.

*Conner*, 543 F.3d at 1221.

Moreover, it is undisputed here that the government suffered no actual damages from the District's submission of its transportation cost report. Davis's contention that an award of nearly $1 billion in civil penalties is warranted because the District did not have physical possession of service documentation, which he concedes actually exists, is contrary to the Eighth Amendment's Excessive Fines Clause. *See United States v. Bajakajian*, 524 U.S. 321, 334 (1998) ("The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish."); *United States v. Mackby*, 261 F.3d 821, 830-31 (9th Cir. 2001). Even if Davis's interpretation of the FCA were otherwise tenable, the canon of constitutional avoidance would counsel its rejection. *Nat'l Mining Ass'n v. Kempthorne*, 512 F.3d 702, 711 (D.C. Cir. 2008).

Finally, even assuming Davis is correct that the cost report certification somehow implicates the 82,615 interim claims, his request for 82,615 statutory penalties fails for lack of proof. As discussed, Davis has failed to carry his burden

60

of proving that the District did not have physical possession of supporting documentation for any particular one of those interim claims, let alone all 82,615. Absent such evidence, there is no basis to award the penalties Davis seeks. *Absher*, 764 F.3d at 714.

## CONCLUSION

The Court should reverse the judgment of the district court and direct entry of judgment for the District of Columbia.

Respectfully submitted,

EUGENE A. ADAMS
Interim Attorney General for
the District of Columbia

TODD S. KIM
Solicitor General

LOREN L. ALIKHAN
Deputy Solicitor General

/s/ Stacy L. Anderson
STACY L. ANDERSON
Senior Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
441 4th Street, NW, Suite 600S
Washington, D.C. 20001
December 2014                     (202) 724-6625

## CERTIFICATE OF SERVICE

I certify that on December 15, 2014, electronic copies of this brief were served through the Court's ECF system, to:

Jeffrey S. Jacobvitz

Tenley A. Carp

/s/ Stacy L. Anderson
STACY L. ANDERSON

## CERTIFICATE OF COMPLIANCE

I further certify that this brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 13,989 words, excluding exempted parts. This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14 point.

/s/ Stacy L. Anderson
STACY L. ANDERSON